**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **TRAVELERS CASUALTY AND SURETY** ) | |
| **COMPANY OF AMERICA, INC.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **CIVIL ACTION 07-0347-WS-B** |
| ) | |
| **EAST BEACH DEVELOPMENT, LLC,** ) | |
| *et al.,* ) | |
| ) | |
| **Defendants.** ) | |

**ORDER**

This multi-party litigation comes before the Court on the following array of interlocking and overlapping Rule 56 motions: Thrasher Waterproofing's Motion for Summary Judgment against East Beach, Travelers and Coastal Builders (doc. 136); Travelers' Motion for Summary Judgment as to Jennings Service Company (doc. 138);[1] Travelers' Motion for Summary Judgment as to Thrasher Waterproofing (doc. 139); Travelers' Motion for Summary Judgment as to Triple A Fire Protection (doc. 140); Travelers' Motion for Summary Judgment as to East Beach Development (doc. 141); and Triple A Fire Protection's Motion for Summary Judgment (doc. 142).[2]  These Motions have been extensively briefed (including supplemental briefing on the equitable issue described in the Order (doc. 160) entered on June 30, 2008) and are now ripe for disposition.[3]

---

[1]     On July 15, 2008, the Court entered an Order (doc. 164) dismissing without prejudice all claims by and between Travelers and Jennings at those parties' joint request; therefore, Travelers' Motion for Summary Judgment as to Jennings (doc. 138) is **moot**.

[2]     Also pending is Thrasher Waterproofing's Motion to Amend or Correct its Memorandum of Law (doc. 145) to remedy its own "misreading" of the contract documents in its previous Rule 56 submissions.  For cause shown, that Motion is **granted**.

[3]     The legal and factual issues animating each of these Motions share marked similarities, and in many respects are identical.  Although the parties (and specifically Travelers, the movant with respect to four of the six Motions) justify this posture on grounds of clarity, the result is a proliferation of repetitive submissions, forcing the Court and the parties to slog

I.      **Background.**[4]

    *A.    East Beach's Contracts with the Contractors.*

    The relevant facts underlying this dispute are largely uncontested.  East Beach Development LLC ("East Beach") is the owner/developer of a beachfront condominium complex known as Lighthouse Condominiums and located in Gulf Shores, Alabama.  (Case Aff. (doc. 138), ¶ 2.)  Rather than contracting with a single general contractor on the project, East Beach developed Lighthouse as a "Multiple Prime Contract Project," meaning that East Beach entered into direct co-prime contracts with each of several contractors concerning the specific portion of the construction work to be performed by that contractor.  (*Id.*)

    *1.    The Triple A and Thrasher Contracts.*

    As a result of this arrangement, East Beach entered into direct written contracts with each of the following entities, among others: Coastal Builders, Inc. ("Coastal"), Triple A Fire Protection, Inc. ("Triple A"), and Thrasher Waterproofing Corp. ("Thrasher").  The contracts between East Beach and Triple A, and between East Beach and Thrasher were each dated March

---

through numerous iterations of the same exhibits and largely identical legal arguments replicated from one motion and brief to the next (and multiple times within the same brief, for that matter), with at most minor variations.  In some instances, as many as four copies of the same affidavit have been filed by the same party, forcing the Court to expend scarce resources filtering out repetitive filings.  Such redundancies and inefficiencies are both unfortunate and avoidable.  These issues could have been submitted in a far more concise manner (enhancing rather than compromising clarity) that would have avoided (a) cluttering the court file with multiple copies of the same documents and (b) obliging the nonmovants to respond to (and the Court to read) multiple slight variants on the same theme, or worse, multiple copies of the same thing.  Nor are these inefficiencies confined to Travelers.  Often, the claimants repeat in their entirety arguments previously articulated by themselves or their fellow claimants, rather than simply adopting them by reference.  The net result is that the straightforward issues animating the summary judgment motions could have been effectively presented with but a small fraction of the bloated filings actually submitted.

    [4]    The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party.  *See Skop v. City of Atlanta, GA*, 485 F.3d 1130, 1136 (11th Cir. 2007).  Thus, with respect to each of the six motions for summary judgment, each nonmovant's evidence is taken as true and all justifiable inferences are drawn in its favor.

29, 2004.  (*See* Turner Aff. (doc. 142), Exh. 2; doc. 136, Exh. 1.)[5]  Each of those similar

contracts identified East Beach as "the Owner" and clearly provided that the agreement was

between the Owner and "the Contractor" (Triple A or Thrasher, respectively), and was executed

solely by the Owner and the Contractor.  These contracts listed Coastal as "the Construction

Manager"; however, Coastal was a signatory to neither of these agreements.  The Triple A and

Thrasher contracts each included an identical provision in which the Contractor acknowledged

that East Beach

> "has employed Coastal Builders, Inc. (the 'Construction Manager') to provide
> Construction Management Services for the Project and that, in such capacity, the
> Construction Manager will serve as the Owner's representative in assisting each
> Contractor in working with the other Contractors involved in the construction
> process to coordinate their respective parts of the Work with each other's work as
> set forth in the Contract Documents.  Recognizing that this is a Multiple Prime
> Contract Project, the Contractor specifically acknowledges, as a part of his
> Contract, its primary responsibility to participate fully with the Owner, the
> Construction Manager and all Project Contractors in the coordination, sequencing
> and execution of its work ...."

(Doc. 136, Exh. 1, § 7.4.1; Turner Aff., Exh. 2, § 7.4.1.)  Pursuant to Section 7.2.1 of these

contracts, the parties agreed that their agreement would be governed by Alabama law.

In brief, the Triple A agreement obligated Triple A to provide labor, materials, equipment

and insurance for a complete fire protection system in the building and parking garage, in

exchange for East Beach's promise to pay the contract sum of $559,000.  (Turner Aff., Exh. 2,

§§ 2, 4.1.)  Meanwhile, the Thrasher agreement obligated Thrasher to furnish labor, materials,

equipment and insurance for various waterproofing features, including walkway and balcony

waterproofing, waterproof coatings and sealers in the parking garage, sealants and caulkings of

windows and doors, ceiling coatings for exterior walkways and balconies, elastomeric coatings

on exterior stucco, concrete and masonry surfaces, and waterproofing to walls and floors of

---

[5]       These dates are reflected on the agreements themselves.  The Case Affidavit
submitted by Travelers in quadruplicate in support of its Rule 56 Motions repeatedly misstates
these dates, reciting a March 9, 2007 date for the Triple A agreement and a March 29, 2007 date
for the Thrasher agreement.  (Case Aff., ¶¶ 7-9.)  Travelers then perpetuates the error in various
places throughout its summary judgment briefs.  From the face of the documents, it is quite clear
that these agreements were executed in March 2004, not March 2007; therefore, Travelers' and
Case's obvious errors in this respect will be disregarded.

elevator pits, all in exchange for East Beach's promise to pay the contract sum of $1,277,124. (Doc. 136, Exh. 1, §§ 2, 4.1.)

The mechanism for progress payments by East Beach in both agreements was identical. Article 5 of the agreements specified that the Contractor was to submit an Application for Payment to the Construction Manager (*e.g.*, Coastal). Coastal would then review the application and, if appropriate, issue a Certificate for Payment, prompting the Owner (East Beach) to authorize Coastal to make payment to the Contractor. (Doc. 136, Exh. 1, § 5; Turner Aff., Exh. 2, § 5.) So East Beach's contracts with Triple A and Thrasher contemplated that Coastal would be a sort of gatekeeper, acting as the intermediary or conduit through which the contractor would make application for payment to East Beach and through which East Beach would make payment to the contractor.

A final relevant provision shared by both agreements specified that Triple A and Thrasher each "waive[d] and release[d] any right, claim or cause of action against [Coastal] that may arise out of Contractor's performance of any work on the Project or [Coastal]'s actions in the performance of its duties under its Agreement with [East Beach] ... except only to the extent [Coastal]'s actions rise to the level of intentional interference with a Contractor's Performance." (Doc. 136, Exh. 1, § 7.8; Turner Aff., Exh. 2, § 7.8.)

       2.    *The Coastal Agreements.*

In addition to the March 2004 contractor agreements with Triple A and Thrasher, East Beach also entered into a pair of contracts with Coastal on April 7, 2004. (*See* doc. 136, at Exhs. 2a & 2b.)[6] The first was a contractor agreement, styled as a "Standard Form of Agreement

---

       [6]     In their summary judgment filings, Thrasher and Triple A repeatedly characterize Coastal as the "General Contractor" on the Lighthouse project. They even offer affidavits by their officials stating in conclusory terms that Coastal was the "General Contractor." (Turner Aff., ¶ 5; Thrasher Aff., ¶ 4.) However, nothing in the contractual documents submitted by Thrasher or Triple A would support such a framing of Coastal's role. Nothing in the summary judgment standard obliges the Court to accept as true the conclusory label that Thrasher or Triple A place on Coastal's function with respect to the Lighthouse project; rather, the contract language speaks for itself in defining Coastal's role. A nonmovant's bare, unsupported, conclusory, self-serving statements in an affidavit are not legally sufficient to create genuine issues of material fact. *See generally Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990) ("[m]ere conclusory allegations and assertions will not suffice" to create genuine

Between Owner and Contractor," and quite similar to those entered into between East Beach and Triple A, and between East Beach and Thrasher.[7]  That contract obliged Coastal to furnish labor, materials, equipment and insurance for "general requirements, sitework, misc. concrete, masonry, structural steel, metal trusses, aluminum handrails, carpentry, cabinets and countertops, doors & hardware, specialties, trash chutes, kitchen appliances, and swimming pools and spas." (Doc. 136, Exh. 2a, § 2.)  Coastal's work obligations under the Contractor Agreement specifically included payment and performance bonds.  (*Id.*)  In exchange for these services, East Beach agreed to pay Coastal the sum of $9,120,048.  (*Id.*, § 4.1.)

The second contract between East Beach and Coastal was also dated April 7, 2004, but was captioned "Standard Form of Agreement Between Owner and Construction Manager."  That document defined Coastal as "the Construction Manager," and detailed the services that Coastal was to provide on the Lighthouse project in that capacity.[8]  The scope of the services to be provided by Coastal as Construction Manager is defined comprehensively over the span of 7 pages of the agreement, with such services to include "assist[ing] the Contractors in the coordination of the sequence of construction and assignment of space in areas where the Contractors are performing work," subject to the Contractors' own primary responsibility to engage in such coordination and sequencing.  (Doc. 136, Exh. 2a, § 2.3.6.)  Coastal was also responsible for "develop[ing] and implement[ing] procedures for the review and processing of applications by Contractors for progress and final payments," for "review[ing] and certify[ing] the amounts due the respective Contractors," for preparing and issuing certificates of payment, and for presenting such applications to East Beach for review and approval of all payments.  (*Id.*,

---

issues of fact at summary judgment stage); *Miller v. Citizens Security Group, Inc.*, 116 F.3d 343, 346 (8th Cir. 1997) ("A conclusory statement in an affidavit ... cannot create a genuine issue of material fact which precludes summary judgment."); *Smith v. Quintiles Transnational Corp.*, 509 F. Supp.2d 1193, 1201 (M.D. Fla. 2007) ("conclusory allegations and unwarranted deductions of fact are not accepted as true" on summary judgment); *Zigmund v. Foster*, 106 F. Supp.2d 352, 356 (D. Conn. 2000) ("The mere verification by affidavit of one's own conclusory allegations is not sufficient to oppose a motion for summary judgment.").

[7]    This agreement will be referred to herein as the "Contractor Agreement."

[8]    This agreement will be referred to herein as the "Construction Manager Agreement."

§§ 2.3.11-2.3.11.5.)  If East Beach approved those applications, the agreement specified, East Beach would deposit the funds for payment into a "Construction Account" from which Coastal would issue payments to the contractors as to all approved amounts.  (*Id.*, § 2.3.11.6.)  With respect to changes in specifications for the work to be performed by Contractors, Coastal was obligated by the Construction Manager Agreement to review requests for changes, assist in negotiating Contractors' proposals, submit recommendations to East Beach and the architect, and prepare change orders and construction change directives if those recommendations were accepted.  (*Id.*, § 2.3.17.)  This agreement also included a provision whereby Coastal and East Beach disclaimed any intent to create any rights for any third parties in the performance of the agreement.[9]  The Construction Manager Agreement lacked any provision obligating Coastal to obtain a performance or payment bond.  No specific price was set forth in the Construction Manager Agreement for Coastal's services provided thereunder.[10]

> **B.      *The Travelers Payment Bond.*

After entering into the agreements with East Beach, Coastal proceeded to obtain a Payment Bond from plaintiff Travelers Casualty & Surety Company of America ("Travelers"). That Payment Bond, bearing #104295762, listed Coastal as the Contractor and Principal, Travelers as the Surety, East Beach as the Owner, and on its face related to a Construction Contract dated April 7, 2004 in the amount of $9,120,048 concerning the Lighthouse project. (Doc. 136, Exh. 7.)  The bond was effective April 8, 2004, and was in the penal sum of $9,120,048.  (*Id.*)

Of critical importance to this action is the question of who constitutes a "Claimant" with a right to seek payment from Travelers under the Payment Bond.  Fortunately, that term is

---

[9]      The relevant language is as follows: "Notwithstanding any other provision of ... the contracts for construction between [East Beach] and the various Contractors, the obligations and duties established herein are solely for the benefit of [East Beach] and are not intended to benefit or create any obligation or duty to any other person, firm, or entity."  (*Id.*, § 14.6.)

[10]      According to the summary judgment record, the $9,120,048 figure recited in the Contractor Agreement included a 5.5% fee to Coastal for its work as both a co-prime contractor and construction manager on the Lighthouse project.  (Case Dep., at 61-62, 73.)  Thus, it appears that Coastal's compensation for both its contractor services and its construction manager services was enumerated exclusively in the Contractor Agreement.

defined in the Payment Bond itself, where it is assigned the following definition:

> "Claimant: An individual or entity having a direct contract with [Coastal] or with a subcontractor of [Coastal] to furnish labor, materials or equipment for use in the performance of the Contract.  The intent of this Bond shall be to include without limitation in the terms "labor, materials or equipment" that part of water, gas, power, light, heat, oil, gasoline, telephone service or rental equipment used in the Construction Contract, architectural and engineering services required for performance of the work of [Coastal] and [Coastal]'s subcontractors, and all other items for which a mechanic's lien may be asserted in the jurisdiction where the labor, materials or equipment were furnished."

(*Id.*, ¶ 15.1.)[11]  Also defined in the Payment Bond is the term "Construction Contract," which means "[t]he agreement between the Owner and the Contractor identified on the signature page, including all Contract Documents and changes thereto."  (*Id.*, ¶ 15.2.)[12]

> ### C.      *Non-Payment of the Contractors for Work Performed.*

The uncontested evidence on summary judgment is that Triple A and Thrasher performed substantial work on the Lighthouse condominium project pursuant to their agreements with East Beach.

For its part, Triple A worked on the project from May 2004 through June 2006 and submitted numerous applications for payment to Coastal as the work was performed.  (Turner Aff., ¶ 6.)  Pursuant to the parties' contractual arrangements, Coastal would then submit those applications to East Beach, which would issue payment to Coastal, which would release those funds to Triple A.  (*Id.*; *see also* doc. 142, Exh. A.)  Triple A submits canceled checks documenting progress payments to it in excess of $460,000, between September 2004 and October 2006, with all such checks being drawn on a Regions Bank account in the name of

---

[11]      This is a verbatim quotation of Paragraph 15.1 of the Payment Bond, except that Coastal has been substituted for the term "the Contractor" wherever it appears.  This substitution is obviously warranted because page one of the Payment Bond lists Coastal immediately under the legend "CONTRACTOR (Name and Address)."

[12]      This iteration of the Payment Bond (as well as several others stuffed into the summary judgment record) is unsigned; however, there is no dispute among the parties that the Payment Bond set forth at, for example, Exibit 7 to document 136 is an accurate and authentic copy of the bond as ultimately executed by Travelers and Coastal.  No objections having been made on this basis, the Court will accept this exhibit as the Payment Bond for purposes of the Rule 56 analysis.

"Coastal Builders, Inc." (Turner Aff., ¶ 6 & Exh. 3.) Additionally, there were several change orders issued concerning Triple A's work on the Lighthouse project. Each change order was printed on Coastal letterhead, was captioned "Subcontract Change Order," and was executed by East Beach as "Contractor" and Triple A as "Subcontractor/Vendor." (*Id.*, ¶ 7 & Exh. 4.) Triple A completed all contract requirements and fully completed its obligations under its agreement with East Beach; however, it is still owed $51,617.70 for work performed on the Lighthouse project. (*Id.*, ¶¶ 8-10.)

Thrasher's experiences on the Lighthouse project were markedly similar to those of Triple A. Thrasher performed waterproofing work on the project from April 2004 through January 2007, submitting numerous applications to Coastal for payment along the way in the total amount of $1,641,491, and receiving payment for most of that amount.[13] Like Triple A, Thrasher received and agreed to a number of change orders with respect to its work on the Lighthouse project. Each such change order was issued on Coastal letterhead, labeled a "Subcontract Change Order," and executed by East Beach as "Contractor" and Thrasher as "Subcontractor/Vendor." (Doc. 136, Exh. 8.) Like Triple A, Thrasher's application for final payment was never paid, despite Thrasher's having completed all of its obligations and conditions precedent to final payment pursuant to its agreement with East Beach. (Thrasher Aff., ¶¶ 5-9.) Thus, Thrasher maintains it remains owed $70,609 for work performed on the Lighthouse project. (*Id.*)

With respect to both Thrasher and Triple A, there is competent summary judgment evidence that East Beach approved their final payment requests and forwarded all necessary

---

[13]    Unlike Triple A, Thrasher neither acknowledges Coastal's dealings with East Beach in connection with these applications for payment nor concedes that East Beach approved and issued payment to Coastal in the first instance. Instead, Thrasher describes a procedure under which the contractor "would issue a pay application to Coastal and then wait until Coastal issued a payment." (Thrasher Aff., ¶ 10.) That said, Thrasher submits no evidence that the contractual procedure for payment (*i.e.*, Thrasher's submission of application for payment to Coastal, Coastal's review of the application and referral of same to East Beach, East Beach's approval of the application, East Beach's issuance of funds to Coastal to pay the application, and Coastal's use of those funds to pay the application) was not followed with respect to each of these payments. Accordingly, Thrasher's omission of pertinent details of the payment procedure from its filings is devoid of analytical significance.

funds to Coastal as construction manager for disbursement to the contractors, but that Coastal failed to issue such funds to the contractor. (Case Dep. (doc. 157, Exh. A), at 155-57; Wessinger Dep. (doc. 157, Exh. B, at 95-96.)[14] Coastal's only justification for not paying the contractors these amounts designated by East Beach was "lack of funds." (Wessinger Dep., at 95.) It is unclear what ultimately happened to the money that East Beach placed in the Construction Account and intended for final payments to Thrasher and Triple A.[15] However, the record does reflect that Travelers had arranged with Coastal (in April 2006, sometime before these final payments became due) for all payments by East Beach on the Lighthouse project to be made into a joint checking account requiring signatures from both Travelers and Coastal before the funds could be disbursed to the respective contractors. (*Id.* at 61-62.)[16] Thus, Travelers possessed shared control over the disbursement of funds by Coastal from the Construction Account after April 2006. While Travelers was involved in the administration of Lighthouse Project funds from this joint account following April 2006, it is uncontroverted that Travelers never exerted its

---

[14]    Travelers argues that Thrasher's final payment application was not submitted to Coastal until January 12, 2007, more than two months after East Beach made its "final deposit" into the Construction Account, and that East Beach failed to furnish any more funds to Coastal thereafter. (Czap Aff. (doc. 165, Exh. 2), ¶¶ 8-9.) However, that evidence is not necessarily inconsistent with Wessinger's testimony that Coastal received enough money from East Beach to pay all contractors who provided materials and services on the Lighthouse project. (Wessinger Dep., at 95-96.) Indeed, this evidence may be readily harmonized through the reasonable inference that East Beach simply prepaid into the Construction Account amounts that were anticipated to be owed to Thrasher. Nonetheless, the discrepancy is noted and will be considered to the extent appropriate for purposes of addressing the respective Rule 56 motions.

[15]    The only record evidence on this point is Travelers' somewhat cryptic statement that Coastal and its principals advised it in or about April 2006 "that Coastal had previously diverted funds from the Lighthouse Project for non-project uses." (Czap Aff., ¶ 2.)

[16]    Coastal's explanation for this procedure was as follows: "At the time that Travelers became involved in the dealings with Coastal Builders, it was obvious to them that there were operational problems with the company. ... It is, as I know now, their standard procedure to come in and take control of funds that are related to projects that are bonded." (Wessinger Dep., at 111.) This justification is reinforced by Travelers' evidence that the purpose of the joint account was "to prevent Coastal (and/or its principals) from diverting any additional funds that it would receive from East Beach on the Lighthouse Project, and to ensure that Coastal used the funds it received from East Beach to pay project related costs." (Czap Aff., ¶ 2.)

control to deny any request by Coastal to make payment from that joint account to Thrasher or Triple A, that Travelers never determined the amounts that would be paid to Thrasher or Triple A; and that Travelers never ordered or directed Coastal not to make payments to Thrasher or Triple A.[17]

>    **D.      The A-1 Glass Issue.**

Another contractor on the Lighthouse project was A-1 Glass Services, Inc. ("A-1 Glass"), which is not presently a party to this litigation.[18]  The undisputed evidence on summary judgment is that A-1 Glass had entered into a "Standard Form of Agreement Between Owner and Contractor" with East Beach on March 29, 2004, with such agreement being substantially similar to the contractor agreements into which East Beach entered with Triple A and Thrasher on that same date.  (Case Aff., ¶ 14 & Exh. 2.)  Much like Triple A and Thrasher, A-1 Glass was not paid for its final invoice of $150,090.25 for work performed under its contractor agreement on the Lighthouse project, prompting A-1 Glass to make a claim on the Travelers Payment Bond. The record reflects that Travelers paid that amount on the understanding that A-1 Glass was a valid "Claimant" under the Payment Bond, after which A-1 Glass assigned all of its claims (including its claims against East Beach) to Travelers.  (Case Aff., ¶ 15 & Exh. 3.)  Travelers now contends that East Beach is responsible for reimbursing the $150,090.25 that Travelers mistakenly paid to A-1 Glass for an obligation that was not covered under the Payment Bond.

---

[17]      In particular, the undisputed evidence on summary judgment is that Travelers "never adjusted or denied any of Coastal's requests to pay any subcontractor, supplier, or co-prime contractor on the Lighthouse Project";  that it "never controlled or determined the amount that was to be paid to any particular subcontractor, supplier, or co-prime contractor"; and that it "never directed or otherwise instructed Coastal not to pay any particular subcontractor, supplier or co-prime contractor."  (Czap Aff., ¶ 4.)

[18]      Travelers initially named A-1 Glass as a defendant in this federal declaratory judgment action, and served it with process; however, A-1 Glass did not respond or fulfill its obligations under the Federal Rules of Civil Procedure.  On November 15, 2007, a Clerk's Entry of Default (doc. 105) was entered against A-1 Glass for failure to plead or otherwise defend, pursuant to Rule 55(a), Fed.R.Civ.P.  On December 7, 2007, the undersigned entered a Default Judgment against A-1 Glass, with a specific decree that Travelers "is permanently released from any and all liability to A-1 Glass Services, Inc. under Payment Bond number 104295762."  (Doc. 115.)

### E.     *The Instant Litigation.*

Plaintiff Travelers initiated this federal action in May 2007 seeking primarily a declaratory judgment of its rights and obligations under the Payment Bond.  In the First Amended Complaint, Travelers sought a declaratory judgment against East Beach, Thrasher, and Triple A (as well as a host of other defendants who are no longer part of these proceedings) that it owed them no obligation to pay their outstanding invoices on the Lighthouse project.[19] Travelers also brought a cause of action against East Beach for indemnity and reimbursement seeking to recover the $150,090.25 payment made to A-1 Glass under the Payment Bond.

After that, the structure of this litigation descended into murk, as the proceedings rapidly proliferated in a maze of additional claims joined by defendants.  In relevant part, these new claims are as follows:  Triple A filed a Counterclaim against Travelers for payment on the Payment Bond in the amount of $51,617.70, as well as a Crossclaim against East Beach for breach of contract and work and labor performed, all in the amount of $51,617.70 plus interest and costs.  (*See* doc. 32.)  Thrasher filed a Counterclaim against Travelers, a Crossclaim against East Beach, and a Third-Party Complaint against Coastal (which had not previously been a party to this action), asserting theories of claim for payment on bond (against Travelers), breach of contract and work and labor performed (against East Beach), and breach of contract (against Coastal), all seeking to recover $70,609 plus interest and costs.  (*See* doc. 96.)[20]

Although the parties have brought a tangled web of overlapping claims, crossclaims, counterclaims, and third-party claims against each other in these federal proceedings (not to

---

[19]     The First Amended Complaint also requested declaratory judgment against two other defendants that are no longer part of these proceedings regarding a different Payment Bond.  In particular, Travelers sought declaratory relief concerning a Payment Bond it issued with respect to a condominium project called the San Carlos Condominiums, which was being developed by nonparty Holiday Development, LLC in Orange Beach, Alabama.  No claims for relief pertaining to the San Carlos Payment Bond remain properly joined in these proceedings today; therefore, this Court will not examine the contours of Travelers' obligations under that bond, but will instead focus exclusively on the Lighthouse project.

[20]     Related state-court litigation involving parallel claims asserted against Travelers, Coastal and East Beach by various other contractors to the Lighthouse project was settled in April 2008.  (*See* doc. 165, at Exh. 1.)  For better or worse, those settlement arrangements did not encompass the instant litigation; therefore, all of these claims remain pending at this time.

mention multiple state-court actions where the same or similar issues were litigated by related parties with respect to the Lighthouse project), this chaotic procedural posture should not obscure the very simple objective of this litigation. Several contractors performed agreed work on a condominium project in Gulf Shores, Alabama. Their work was satisfactory and complete. But they were not fully paid. After all the layers of procedural and legal complexity are stripped away, the only question presented in this lawsuit is who is responsible for paying these contractors. This fundamental, ultimate objective informs and guides the analysis set forth herein.

## II.     Summary Judgment Standard.

Summary judgment should be granted only if "there is no genuine issue as to any material fact and ... the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its responsibility, the burden shifts to the nonmovant to show the existence of a genuine issue of material fact. *Id.* "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted). "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted). "Summary judgment is justified only for those cases devoid of any need for factual determinations." *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

"The applicable Rule 56 standard is not affected by the filing of cross-motions for summary judgment." *Godard v. Alabama Pilot, Inc.*, 485 F. Supp.2d 1284, 1291 (S.D. Ala. 2007); *see also May v. A Parcel of Land*, 458 F. Supp.2d 1324, 1333 (S.D. Ala. 2006) (same). Indeed, the Eleventh Circuit has explained that "[c]ross-motions for summary judgment will not,

in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (citation omitted); *see also Wermager v. Cormorant Tp. Bd.*, 716 F.2d 1211, 1214 (8th Cir. 1983) ("the filing of cross motions for summary judgment does not necessarily indicate that there is no dispute as to a material fact, or have the effect of submitting the cause to a plenary determination on the merits").  Nonetheless, "cross-motions may be probative of the absence of a factual dispute where they reflect general agreement by the parties as to the dispositive legal theories and material facts."  *Godard*, 485 F. Supp.2d at 1291; *see also May*, 458 F. Supp.2d at 1333.  That is precisely the case here, as all parties appear to be in agreement that the material facts are undisputed and that certain discrete legal issues lie at the root of all claims presented for resolution herein.

III.    **Analysis.**

Despite the multiplicity of summary judgment motions filed by the parties, and the proliferation of briefing concerning same, the issues presented for resolution by the Court are narrowly circumscribed to five discrete questions.  Each will be addressed in turn.

A.    ***Are Triple A and Thrasher Entitled to Recovery Under the Payment Bond?***

All of the Motions for Summary Judgment brought by or against Triple A and Thrasher (collectively, the "Claimant Contractors") are focused on the contract interpretation issue of whether those entities are or are not entitled to tap the Travelers Payment Bond to recover their unpaid invoices for work performed on the Lighthouse project.[21]  These Motions hinge on the singular question of whether these Claimant Contractors qualify as "Claimants" who are entitled to make claims under the Payment Bond.  The Court now considers that issue, aggregating all of

---

[21]    Although this question has been briefed time and time again over the span of five different summary judgment motions, the parties have made no showing that a separate determination is needed with respect to each contractor.  Stated differently, all indications before the Court are that, despite the proliferation of Rule 56 motions and the barrage of briefs coming from all interested parties, Triple A and Thrasher are situated substantially identically with respect to their legal right to recover under the Payment Bond.  Certainly the parties have identified no meaningful distinction between them, despite their submission of dozens of pages of briefs that are ostensibly specific to each claimant.  In the absence of any analytical basis warranting separate examination of the rights of Triple A and Thrasher under the Payment Bond in an individual-specific manner, the Court will consider their rights in the aggregate.

the arguments presented by Travelers and the respective Claimant Contractors in their various summary judgment submissions for a single consolidated analysis.

The starting point of the discussion is of necessity the terms of the Payment Bond itself. It is well settled that "a surety in Alabama has the right to stand on its contract and to exact compliance with its stipulations, which may not be extended by construction or implication beyond the precise terms of the agreement." *Hightower and Co. v. U.S. Fidelity and Guar. Co.*, 527 So.2d 698, 703 n.1 (Ala. 1988). Moreover, Alabama law provides that "the general principles of contract interpretation apply" to performance bonds akin to the Payment Bond at issue here. *Bank of Brewton, Inc. v. International Fidelity Ins. Co.*, 827 So.2d 747, 752 (Ala. 2002); *see also Hightower*, 527 So.2d at 703 n.1 ("The contract of a surety ... is to be construed according to the intent of the parties and the implied condition of good faith," such that any attempt by either party to broaden or exceed the contract terms would breach the duty of good faith).

Relevant tenets of contract interpretation under Alabama law include the following: "The issue whether a contract is ambiguous or unambiguous is a question of law for a court to decide. ... If the terms within a contract are plain and unambiguous, the construction of the contract and its legal effect become questions of law for the court." *Nationwide Ins. Co. v. Rhodes*, 870 So.2d 695, 696-97 (Ala. 2003) (citation omitted); *see also Mega Life and Health Ins. Co. v. Pieniozek*, 516 F.3d 985, 991 (11th Cir. 2008) (under Alabama law, whether contract is ambiguous or not is a question of law for the court). "General contract law requires a court to enforce, as it is written, an unambiguous and lawful contract." *Drummond Co. v. Walter Industries, Inc.*, 962 So.2d 753, 780 (Ala. 2006). Moreover, "[i]n determining whether the language of a contract is ambiguous, courts construe the words according to the interpretation ordinary men would place on the language used therein. ... The words are given the meaning that persons with a usual and ordinary understanding would place on the words." *Progressive Specialty Ins. Co. v. Naramore*, 950 So.2d 1138, 1141 (Ala. 2006) (citations and internal quotations omitted). "If the trial court finds the contract to be ambiguous, it must employ established rules of contract construction to resolve the ambiguity," and may only submit the ambiguity to the jury if application of these canons of construction is insufficient to resolve it. *Pieniozek*, 516 F.3d at 992 (internal quotations and citations omitted); *see also New Gourmet*

-14-

*Concepts, Inc. v. Siedo Investments Co.*, --- So.2d ----, 2007 WL 3050975, *6 (Ala. Oct. 19, 2007) ("When we find an agreement to be ambiguous, we must employ established rules of contract construction to resolve the ambiguity found in the inartfully drafted document.") (citation omitted).  With these principles in mind, the Court now examines the language of the Payment Bond.

As discussed, the Payment Bond specifically defines "Claimants" who are entitled to make claim on said Payment Bond as entities "having a direct contract with [Coastal] or with a subcontractor of [Coastal] to furnish labor, materials or equipment for use in the performance of the Contract."  (Payment Bond, ¶ 15.1.)  On its face, then, eligibility for relief under the Payment Bond hinges on an entity's ability to satisfy both of the following requirements: (1) that it have a "direct contract" with Coastal or a subcontractor of Coastal; and (2) that the subject of such direct contract be the furnishing of labor, materials or equipment "for use in the performance of the Contract."  The Claimant Contractors do not dispute that they qualify as Claimants under the Payment Bond only if they satisfy both of these requirements.

The summary judgment record is devoid of evidence from which a reasonable finder of fact could conclude that the Claimant Contractors had a "direct contract" (written or oral, express or implied) with Coastal or any subcontractor of Coastal.  Indeed, each of the Claimant Contractors entered into Contractor Agreements with East Beach (not Coastal), wherein they agreed to perform certain specified work on the Lighthouse project in exchange for East Beach paying them certain agreed sums of money.  None of those Claimant Contractors entered into a written contract with Coastal (much less any subcontractor of Coastal) relating to the Lighthouse project.

Notwithstanding the glaring, obvious absence of a direct contract between the Claimant Contractors and Coastal, Triple A and Thrasher proffer a host of creative but ultimately meritless arguments attempting to construct one from thin air.  First, with a sleight of hand, a wink and a nod, they urge the Court to find an implied-in-fact contract from the course of dealing between them and Coastal, even as they candidly acknowledge being unable to identify a single authority that might support such a remarkable proposition.  The record certainly establishes that Coastal served as the middleman through which East Beach monitored and directed the Claimant Contractors' performance, evaluated their applications for payment, and compensated them for

their work.[22]  But the mere fact that a contracting party has ongoing dealings with the intermediary/ agent/ administrator of the other contracting party in the course of performing a contract does not create a contract with the intermediary, at least where (as here) nothing in those facts supports the existence of the fundamental prerequisites of offer, acceptance, consideration, and mutual assent.  *See, e.g., City of Huntsville v. Stove House 5, Inc.*, --- So.2d ----, 2008 WL 2223039, *6 (Ala. May 30, 2008) (explaining that implied contracts arise in circumstances which, according to ordinary course of dealing and common understandings, show a mutual intent to contract); *Steiger v. Huntsville City Bd. of Educ.*, 653 So.2d 975, 978 (Ala. 1995) (observing that implied-in-fact contracts require proof of same elements required for express contract, and that "[n]o contract is formed without an offer, an acceptance, consideration, and mutual assent to terms essential to the contract").  That the Claimant Contractors worked with Coastal in the course of performing their contractual obligations to East Beach, and that Coastal worked with the Claimant Contractors in the course of performing its contractual obligations to East Beach, is wholly inadequate to establish the necessary elements of contract formation under Alabama law.[23]  Triple A and Thrasher agreed to perform work for East Beach, not Coastal.  And it was East Beach, not Coastal, who agreed to pay them for it.  Coastal was a mere administrator

---

[22]      In this regard, Triple A characterizes Coastal's activities as its "voluntary assumption of the duty to pay Triple A for performance."  (Triple A Brief (doc. 142), at 9.)  Far from a "voluntary assumption" of a duty, Coastal's act of relaying funds from East Beach to Triple A was pursuant to an express contractual obligation of Coastal under the terms of its Construction Manager Agreement with East Beach.  Coastal did not voluntarily assume anything.  To the contrary, Coastal's acts of transmitting East Beach funds to Triple A to pay for Triple A's work on the Lighthouse project amounted to nothing more than compliance with Coastal's contractual duties owed to East Beach, and did not give rise to a phantom contract between Coastal and Triple A.

[23]      In this regard, the Court recognizes that the existence of intent or mutual assent sufficient to establish an implied contract is generally a question for the trier of fact.  *See, e.g., Wadsworth House Movers, Inc. v. Salvage One Demolition, Inc.*, 474 So.2d 686, 688 (Ala. 1985); *Big Thicket Broadcasting Co. of Alabama, Inc. v. Santos*, 594 So.2d 1241, 1243 (Ala.Civ.App. 1991).  But the Claimant Contractors have failed to identify any record evidence from which a reasonable factfinder could infer the existence of mutual assent and contract formation.  Therefore, under the specific circumstances of this case, it is appropriate for the Court to decide this question on summary judgment.

-16-

in the process, and cannot reasonably be viewed as a direct contracting entity vis a vis those Claimant Contractors.[24]

Second, Triple A and Thrasher argue that a direct contract between each of them and Coastal can be divined from the fact that Coastal listed them as "Subcontractors" on applications for payment.  In this regard, Thrasher goes so far as to suggest that the designation of Thrasher as a "Subcontractor" on a pay application "is an admission by Coastal that Thrasher was one of its subcontractors."  (Thrasher Brief (doc. 136), at 9.)  Triple A advances a similar contention.  (*See* Triple A Reply (doc. 154), at 4-5.)  This theory places far more weight on the pay applications than they reasonably can bear.  The mere presence of the preprinted term

---

[24]        To take the argument one step further, each of the Claimant Contractors specifically acknowledged in its Contractor Agreement with East Beach that the Lighthouse project was structured as a "Multiple Prime Contract Project" and that East Beach had hired Coastal to provide construction manager services and to serve as East Beach's representative on the Lighthouse project.  (Contractor Agreements, § 7.4.1.)  Each Claimant Contractor also expressly recognized that part of its contractual obligation to East Beach was to cooperate with Coastal and others in the coordination, sequencing and execution of the work.  (*Id.*)  These contract documents establish with crystalline clarity that the Claimant Contractors were fully apprised of Coastal's contractual relationship with East Beach, and specifically that Coastal was administering aspects of the Lighthouse project on East Beach's behalf.  Thus, when the Claimant Contractors dealt with Coastal as to matters such as change orders and payment applications, they well knew that Coastal was merely serving as East Beach's liaison in such dealings.  Furthermore, the Claimant Contractors expressly disavowed any rights, claims or causes of action against Coastal in § 7.8 of their Contractor Agreements with East Beach, thereby confirming the Claimant Contractors' knowledge and understanding that they were not contracting directly with, and enjoyed no contractual right of recovery against, Coastal for its role in providing construction manager services.  Such circumstances negate any contention by the Claimant Contractors that their "course of dealing" with Coastal in performing their duties under their agreements with East Beach somehow magically gave rise to direct contractual obligations between the Claimant Contractors and Coastal.  The language of the Contractor Agreements unambiguously establishes that the Claimant Contractors knew better, notwithstanding their self-serving arguments to the contrary today.  The same is true of Coastal, which could not possibly have intended to enter into a direct contract with the Claimant Contractors regarding the construction manager services it was already contractually bound to East Beach to perform, particularly where § 14.6 of its contract with East Beach specified that Coastal's construction manager duties and obligations to East Beach were "not intended to benefit or create any obligation or duty to" anyone else.  Simply put, the contractual language unequivocally refutes any suggestion that the Claimant Contractors and Coastal intended to enter into a direct contractual relationship with each other.

"subcontractor" on a Coastal form to describe Thrasher on an ancillary document prepared by Coastal is far too slender an evidentiary reed to support the existence of a direct contractual relationship between them that does not otherwise exist.  It cannot and does not rewrite the relevant contract documents, uproot the contractual infrastructure, or drastically retool the contractual relationships underlying the Lighthouse project from a multiple prime arrangement to a general contractor and subcontractor arrangement.  The Claimant Contractor arguments to the contrary are entirely unpersuasive.  Besides, nothing in those pay applications purports to identify Coastal as the principal or to state that Triple A or Thrasher are <u>Coastal</u>'s subcontractor, specifically, as opposed to somebody else's subcontractor.  In short, the Claimant Contractors cannot seize on an errant bit of terminology on a preprinted form to support the existence of a contractor/ subcontractor legal relationship, when the contract documents and all surrounding facts concerning the parties' dealings conclusively establish that no such relationship existed.[25]

_____

[25]     Indeed, the notion that the Claimant Contractors were "subcontractors" of Coastal borders on the nonsensical.  Alabama courts have endorsed the commonly-accepted legal definition of "subcontractor" as "one who perform[s] some portion of the contract of the general contractor" or "[o]ne who takes from the principal or prime contractor a specific part of the work undertaken by the principal contractor."  *H.R.H. Metals, Inc. v. Miller ex rel. Miller*, 833 So.2d 18, 23 (Ala. 2002) (citations omitted); *see also Avondale Industries, Inc. v. International Marine Carriers, Inc.*, 15 F.3d 489, 494 (5th Cir. 1994) ("A subcontractor is one who takes a portion of a contract from the principal contractor or another subcontractor.").  The unambiguous summary judgment record reflects that the Claimant Contractors did not take a portion of a contract from Coastal, but instead contracted with East Beach to perform different (albeit in some instances complementary) scopes of work to those contracted by Coastal to perform.  For example, Coastal agreed to provide labor and materials for miscellaneous concrete and masonry.  Thrasher agreed to provide waterproof coatings to certain surfaces on the building, including concrete and masonry.  There is no overlap in that scope of work.  Nothing in the contract documents suggests that East Beach hired Coastal to apply waterproof coatings to anything, or that Coastal farmed that work out to Thrasher.  To hold otherwise would be to find that East Beach contracted with Coastal to perform certain work on the Lighthouse project, in exchange for certain compensation, then contracted with the Claimant Contractors to perform the same work on the Lighthouse project, in exchange for certain additional compensation, such that East Beach was essentially agreeing to pay twice for the same work by contracting with two different entities to perform the same job.  That's not how subcontracting arrangements work, and such an absurd result is not supported by the contract language or common sense.  To call the Claimant Contractors subcontractors of Coastal would be to ignore their written agreements with East Beach.  Given these circumstances, the stray use of the word "subcontractor" in a pay application document cannot create a legal relationship that is otherwise plainly lacking.

Third, the Claimant Contractors point to the change orders issued by Coastal, which are captioned "Subcontract Change Orders" and which reference the Claimant Contractors as the "Subcontractor/Vendor."  Once again, Triple A and Thrasher would parlay the use of the term "subcontractor" in an ancillary document into an admission of a direct contractual relationship between them and Coastal.  There are serious infirmities in this line of reasoning.  Most fundamentally, the change orders cannot create a contractual relationship between Coastal and the Claimant Contractors because they were entered into between East Beach and the Claimant Contractors.  Coastal was neither party nor signatory to the change orders.  That they were issued on a Coastal form does not establish otherwise.  Moreover, to the extent that Claimant Contractors would rely on the use of the term "subcontractor" in those documents, they ignore the fact that East Beach (not Coastal) is listed as the "Contractor."  Far from indicating that the Claimant Contractors were a subcontractor of Coastal, then, these change orders reflect that the Claimant Contractors were in the role of vendor/subcontractor, with East Beach as contractor.  Nothing in those change orders modifies the contractual relationships specified in the underlying agreements, much less creates or evinces a contractor/subcontractor relationship between Coastal and the Claimant Contractors.[26]  And Thrasher's conclusory statement that the change orders amount to an "admission" by Coastal that Thrasher was its subcontractor is similarly off-base and unsupported by the text of those exhibits.

Fourth, Triple A proffers an argument on delegation of duties predicated on § 318 of the *Restatement (Second) of Contracts*.  As posited by Triple A, the argument is as follows: East Beach contractually agreed to pay Triple A for its work.  East Beach then delegated the duty to pay Triple A to Coastal.  When Coastal accepted that delegation, began performance, but failed

---

[26]     Claimant Contractors' argument also fails from a basic, common-sense perspective.  As noted above, each of the Claimant Contractors entered into detailed contractor agreements with East Beach specifying in extensive detail the work that those Claimant Contractors were to perform and the compensation they were to receive.  On their face, the change orders did nothing more than modify the work and compensation specified in those contractor agreements with East Beach.  As the change orders merely amended the original contractor agreements between the Claimant Contractors and East Beach, to reason that the change orders somehow created brand new contracts between the Claimant Contractors and Coastal is to engage in wishful thinking unencumbered by logic or common sense.

to complete performance, Coastal became liable to Triple A.  (Triple A Brief (doc. 142), at 10-11.)  This argument (which Travelers regrettably never addressed head-on in its numerous briefs) fails for two reasons.  As an initial matter, it proceeds from a selective reading of § 318, the relevant portion of which states that, where a duty is delegated by an obligor to another, "[t]he obligee may ... have rights against the other as an intended beneficiary of the promise to assume the duty."  *Rest. 2d Contr.* § 318, Comment d.[27]  So, yes, Triple A is correct that Coastal <u>may</u> be liable to it based on accepting the delegation of East Beach's promise to pay Triple A, but § 318 clearly provides that any such liability would be rooted in third-party beneficiary principles.  Section 318 cannot help Triple A because Triple A is not a third-party or intended beneficiary of the Construction Manager Agreement between Coastal and East Beach, as a matter of law.[28]  Alternatively, even if Triple A could hold Coastal liable on a delegated-duty theory pursuant to § 318, that theory of liability cannot logically constitute a "direct contract" between Triple A and Coastal of the kind necessary to trigger liability to Travelers on the Payment Bond; rather, Triple A's delegated duty theory would amount to a merely indirect basis for holding Coastal accountable, as opposed to liability predicated on a direct contract between them, as needed to trigger Travelers' Payment Bond obligation.  Accordingly, this theory for circumventing the absence of a direct contract between the Claimant Contractors and Coastal for purposes of their claims on the Travelers Payment Bond is rejected.

---

[27]     The illustration on which Triple A relies relates to Comment d; therefore, Comment d provides context and meaning to the illustration, and reveals the inherent fallacy in Triple A's attempt to analogize this case to that illustration.

[28]     Under Alabama law, "[i]n order for a person to be a third-party beneficiary of a contract, the contracting parties must have intended to bestow benefits on third parties." *Edwards v. Costner*, 979 So.2d 757, 763 (Ala. 2007) (citation omitted).  The Construction Manager Agreement between Coastal and East Beach – through which East Beach delegated the duty of paying Triple A to Coastal – unambiguously negates any suggestion that those parties intended to bestow benefits on Triple A.  Indeed, § 14.6 of that Agreement provides that "the obligations and duties established herein are solely for the benefit of [East Beach] and are not intended to benefit or create any obligation or duty to any other person, firm, or entity." Therefore, any attempt by Triple A to claim a direct contractual relationship with Coastal based on the Coastal-East Beach Construction Manager Agreement is fatally flawed, and § 318 of the *Restatement (Second)* does not remedy those defects.

There being no direct contract between Triple A or Thrasher, on the one hand, and Coastal or any subcontractor of Coastal, on the other, these entities plainly fall outside the scope of that class of "Claimants" authorized to make claims on the Travelers Payment Bond issued to Coastal. Accordingly, Triple A and Thrasher cannot recover from Travelers on that Payment Bond.[29]

---

[29] This determination of no direct contract is the linchpin of the Court's ruling as to whether the Claimant Contractors are or are not proper Claimants under the Payment Bond. To be sure, the parties devote considerable energy debating the second prong of the "Claimant" definition in the Payment Bond, which provides that an entity having a direct contract with Coastal is a "Claimant" if that direct contract is "to furnish labor, materials or equipment for use in the performance of the Contract." Travelers insists that this element cannot be satisfied because the Payment Bond defines the term "Construction Contract" to mean the Contractor Agreement between Coastal and East Beach. Travelers is missing the point. The definition of "Claimant" found at Paragraph 15.1 of the Payment Bond does not use the term "Construction Contract," so the instrument's definition of that term is utterly irrelevant. Instead, the definition of "Claimant" in the Payment Bond refers only to "the Contract." Which contract is that? There are many contracts floating around in the parties' arrangements herein, not the least of which is the Construction Manager Agreement between Coastal and East Beach, as to which each of the Claimant Contractors arguably did provide labor, materials or equipment for use in the performance of same (inasmuch as they performed the underlying project work that Coastal was charged with administering in the Construction Manager Agreement). If Travelers intended for claimant status on the Payment Bond to be restricted to entities providing services on the "Construction Contract" (as that term is defined in the Bond), then the definition of "Claimant" should have referred to that specific agreement, rather than the ambiguous term, "the Contract." An insurance company is not permitted to draft an ambiguous provision, then select the interpretation of that provision most favorable to it; to the contrary, Alabama law is clear that such provisions must be construed against the drafter. *See, e.g., Safeway Ins. Co. of Alabama, Inc. v. Herrera*, 912 So.2d 1140, 1143 (Ala. 2005) ("To the extent the language of an insurance policy provision is ambiguous, all ambiguities must be resolved against the insurance company."); *Ex parte Palm Harbor Homes, Inc.*, 798 So.2d 656, 661 (Ala. 2001) (citing "familiar rule of contract construction" that "any ambiguity must be construed against the drafter of the contract"). Accordingly, the ambiguous term "the Contract" in Paragraph 15.1 of the Payment Bond must be construed against Travelers, and that term must therefore be construed as referring to the Construction Manager Agreement between Coastal and East Beach rather than the Contractor Agreement between those two entities. As such, the Claimant Contractors satisfy the second element of the "Claimant" test for summary judgment purposes, but not the first. Thus, it is for their lack of a direct contract with Coastal, and for that reason alone, that the Claimant Contractors' applications to secure compensation under the Payment Bond must fail.

### B.      Is East Beach Entitled to Recover from Travelers under the Payment Bond?

Next, the Court considers the portion of Travelers' Motion for Summary Judgment against East Beach seeking a declaration "that Travelers faces no liability to East Beach under [the] Payment Bond ... in relation to any claim and/or lien that has been asserted by" Triple A or Thrasher.  (Travelers Motion (doc. 141), at 1-2.)[30]

Much of Travelers' summary judgment brief on this point focuses on the argument that East Beach does not meet the Payment Bond's definition of a "Claimant" because East Beach did not have a direct contract with Coastal to furnish labor, materials or equipment for use in the performance of a Coastal contract.  All of this is correct, of course, but it misapprehends the nature of East Beach's theory of recovery under the Payment Bond.  East Beach explains that its demand against the Payment Bond is predicated on the notion that East Beach was an intended beneficiary of that Payment Bond.[31]  East Beach theorizes that Travelers' failure to pay Thrasher and Triple A amounts to a breach of the Payment Bond, which is actionable by East Beach as a third-party beneficiary.  By East Beach's own reckoning, then, "if ... Thrasher and Triple A were direct contractors to Coastal, then East Beach is entitled to assert its demand against the Travelers' bond."  (East Beach Brief (doc. 157), at 5.)  But this Court has already found as a

---

[30]      The aspect of Travelers' Motion for Summary Judgment against East Beach seeking a monetary judgment for reimbursement of funds improperly paid to A-1 Glass will be addressed separately.

[31]      East Beach provides no authority or argument to support this position, nor does Travelers respond to it.  As such, the parties' briefing is decidedly unhelpful in facilitating the Court's evaluation of East Beach's "intended beneficiary" argument.  That said, Alabama law provides that "[t]o recover under a third-party beneficiary theory, the complainant must show: 1) that the contracting parties intended, at the time the contract was created, to bestow a direct benefit upon a third party; 2) that the complainant was the intended beneficiary of the contract; and 3) that the contract was breached."  *McGowan v. Chrysler Corp.*, 631 So.2d 842, 848 (Ala. 1993) (citation omitted).  Paragraph 1 of the Payment Bond strongly supports the existence of both (1) and (2), given its explicit provision that Coastal and Travelers "bind themselves ... to [East Beach] to pay for labor, materials and equipment furnished for use in the performance of the Construction Contract."  In light of the foregoing contract language, and Travelers' failure to present any argument or authority to the contrary, the Court finds that East Beach was indeed an intended third-party beneficiary of the Payment Bond.  That said, for the reasons stated herein, there has been no breach of the Payment Bond, so East Beach's demands on the Payment Bond are invalid, as a matter of law, notwithstanding its status as an intended beneficiary of same.

-22-

matter of law that Thrasher and Triple A were <u>not</u> direct contractors to Coastal; therefore, East Beach's demand on the Payment Bond fails.  Stated differently, for East Beach to be able to recover on the Payment Bond as a third-party beneficiary, it must establish that Travelers breached the Payment Bond by not paying the Claimant Contractors.  *See, e.g., Sheetz, Aiken & Aiken, Inc. v. Spann, Hall, Ritchie, Inc.*, 512 So.2d 99, 101-02 (Ala. 1987) (plaintiff cannot prevail on a third-party beneficiary theory under Alabama law unless it shows, *inter alia*, that the contract was breached).  This it has not done and cannot do.  There was no breach because Thrasher and Triple A are not valid claimants and are therefore ineligible to make claims on the Payment Bond, such that Travelers' denial of those claims was not a breach.

The analysis does not end here.  East Beach advances an incipient equitable argument[32] that Travelers was directly at fault for the non-payment of the final applications for payment by Thrasher and Triple A because Travelers was controlling all payments issued by Coastal on the Lighthouse project at that time.  In other words, East Beach's theory is that Travelers, and not Coastal, made the decision that the funds submitted by East Beach to Coastal to make the final payments for Thrasher and Triple A would be used for other purposes.  Although briefing on Travelers' Rule 56 motions relating to them had already concluded, Thrasher and Triple A enthusiastically joined in East Beach's equitable argument.  When pressed by the Court for the basis for their contention that these circumstances equitably bar Travelers from being able to enforce the terms of the Payment Bond to deny the claims of East Beach, Triple A and Thrasher, those entities invoke the doctrines of constructive trust and equitable estoppel, even as they candidly admit being unable to locate in their "extensive research" any cases where those principles were applied in a situation comparable to this one.  (Doc. 163, at 2.)

As a strictly doctrinal matter, neither theory makes sense here.  It is a well-worn and oft-

---

[32]      As described in detail in the Order (doc. 160) entered on June 30, 2008, the timing and manner in which this equitable argument unfolded was both unfortunate and inadequate to enable the Court to decide that issue meaningfully in the context of the initial summary judgment submissions.  Because the issue had been briefed insufficiently by both sides, the June 30 Order directed the parties to submit supplemental memoranda confined to this narrow issue, which the parties have since done.  (*See* docs. 163, 165, 166.)  The Court's analysis of this equitable issue is the product of scrutiny of these supplemental legal and evidentiary submissions.

repeated formulation of Alabama law that "[a] constructive trust is a creation of equity that operates to prevent unjust enrichment. ... A constructive trust may be imposed when property has either been acquired by fraud, or where, in the absence of fraud, it would be inequitable to allow the property to be retained by the person who holds it." *Hanner v. Metro Bank and Protective Life Ins. Co.*, 952 So.2d 1056, 1070 (Ala. 2006) (citations omitted).  If there were evidence that Travelers had skimmed money from the joint account that it established with Coastal, rendering the account balance too low for contractors to be paid what they were owed, then constructive trust might be applicable here.  But there is neither evidence nor allegation that Travelers ever received or retained a dime from that account.  To the contrary, the uncontroverted evidence is that, because of mismanagement (or worse) by Coastal, the balance in the joint account was woefully inadequate to meet the obligations to Lighthouse contractors and suppliers, and that Travelers funneled hundreds of thousands of dollars of its own funds into that account to help bridge the chasm.  (Czap Aff., ¶ 10.)  The mere fact that Travelers had a right to control payments to contractors from the inadequate pool of resources in the joint account does not and cannot logically give rise to a constructive trust in the absence of any suggestion that Travelers ever wrongfully received or retained any of those resources for itself.[33]

---

[33]    In response, East Beach, Triple A and Thrasher offer two counterarguments, neither of which is persuasive.  First, they point to the statements in Alabama case law recognizing that a court "decreeing a constructive trust is bound by no unyielding formula.  The equity of the transaction must shape the measure of relief.  This principle affords a court of equity wide powers to do what it thinks right and just." *Cherpes v. Cherpes*, 185 So.2d 137, 143 (Ala. 1966) (citations and quotations omitted).  As noted, there is no evidence that Travelers acquired or retained any funds from that joint checking account; therefore, even accepting the expansive equitable nature of the constructive trust doctrine as urged by the developer and contractors, the Court is of the opinion that it would be neither right nor just to impose a constructive trust on Travelers' property where there is not so much as a whiff of evidence that Travelers received ill-gotten gains from the account.  Second, these entities assert that, while there is no wrongfully acquired property *per se*, Travelers did hold the "***benefit*** of controlling the contract funds East Beach intended to be paid to the Contractors."  (Doc. 166, at 2.)  Obviously, no constructive trust can be imposed on some inchoate, intangible "benefit" that Travelers received.  Perhaps (as the claimants insist) Travelers erred in wearing the dual hats of providing the Payment Bond and overseeing the payment of contractors from the Construction Account.  But in the absence of a showing (which has not been made) that as a result of that dual role Travelers wrongfully received or retained some property that equitably belonged to Triple A or Thrasher, the theory of constructive trust is manifestly inapplicable to these circumstances.

The "equitable estoppel" notion is even more attenuated and ill-suited to this fact pattern. As the claimants recognize, Alabama law provides that "[t]he doctrine of equitable estoppel ... precludes a party from taking a position in one instance inconsistent with that party's position in another instance if to do so would prejudice another party."  *Golden v. Bank of Tallassee*, 639 So.2d 1366, 1369 (Ala. 1994).  East Beach, Triple A and Thrasher further concede that the "basic elements of equitable estoppel are that an actor, who has knowledge of the true facts, communicates something in a misleading way, either by words, conduct or silence; the other parties rely upon that conduct; or the other parties would be harmed materially if the actor is later permitted to assert any claim inconsistent with his earlier conduct."  (Doc. 163, at 3-4 (citing *Mazer v. Jackson Ins. Agency*, 340 So.2d 770, 773 (Ala. 1976)).)  Where is the evidence that Travelers took an inconsistent position or misled East Beach, Triple A or Thrasher in any way?  This Court is aware of none.  It has never been alleged or shown that Travelers stated, suggested or implied that Triple A and Thrasher were valid claimants under the Payment Bond. There is no evidence that Travelers has flip-flopped its position, or that it has otherwise conducted itself in an inconsistent manner that would render it unjust, unfair or inequitable to allow it to argue in this case that Triple A and Thrasher are not, in fact, valid claimants under the express terms of the Payment Bond.[34]  Equitable estoppel has no application to the circumstances presented here.

In short, this entire line of reasoning by East Beach, Triple A, and Thrasher is unfounded. There is no evidence, and no reason to believe, that Travelers improperly placed a hand in the cookie jar to pocket funds from the Coastal joint account that would otherwise have been used to pay Thrasher and Triple A.  There is no evidence that Travelers manipulated the contractor

---

[34]    The chief "inconsistency" identified by East Beach, Triple A and Thrasher is that Travelers "on the one hand, behav[ed] as if all []contractors are claimants under the bond (by managing all contract funds) and, on the other hand, now claim[s] it has no duty to pay Thrasher and Triple A because they are not claimants under the bond."  (Doc. 166, at 4.)  This reasoning is opaque.  By establishing the joint account for payment of Lighthouse project expenses, Travelers was not acknowledging, admitting or suggesting that Triple A or Thrasher were valid claimants under the Payment Bond or that Travelers had any obligation pursuant to that Payment Bond to make certain that those particular entities were paid in full.  The Court finds nothing inconsistent or misleading in Travelers' conduct in this regard.  Even if such an inconsistency did exist, claimants offer no evidence of reliance or prejudice, as required for equitable estoppel to apply.

payment process to secure its own financial advantage, all to the detriment of Triple A and Thrasher.  It is undisputed that, because of errors or omissions by Coastal, there was not enough money in the joint checking account to cover all of the outstanding obligations owed to Lighthouse contractors and suppliers.  It is also undisputed that Travelers pumped in hundreds of thousands of dollars of its money into that account to diminish the shortfall and to allow a greater percentage of those obligations to be paid.  What's more, Triple A and Thrasher have adduced not a scrap of evidence that their final applications would have been paid but for Travelers' involvement in the administration of the joint account with Coastal.  They have identified no evidence giving rise to an inference that Travelers blocked them from being paid, much less rebutting Travelers' evidence that it signed all checks (which were prepared by Coastal) for payment of contractors on the Lighthouse project "upon confirmation that the subcontractor, supplier, or co-prime contractor had actually supplied labor and/or materials on the Lighthouse Project."  (Czap Aff., ¶ 4.)  Instead, they offer up a raft of speculation and conjecture borne from the fact that Travelers was a joint signatory on the checking account with Coastal for contractor payments made after April 2006.[35]  That evidence shows that Travelers had at least a degree of control over how the funds were allocated, but is far too benign to

---

[35]      The claimants brazenly assert that "it is undisputed Travelers made the decision about which []contractors were paid and which were not."  (Doc. 163, at 2.)  That statement is incorrect.  Travelers' status as a joint signatory on a checking account does not automatically transform it into an ultimate decisionmaker, and all of Travelers' evidence is to the contrary.  They also read a portion of the June 30 Order as having "held" that "Travelers ultimately decided which contractors were paid, and how much."  (*Id.* at 1.)  The June 30 Order did not so hold, but instead merely summarized the extremely limited evidence and argument proffered by East Beach in its previous filings.  To be clear, that fragmentary evidence was only that a joint account was established for the Lighthouse project in April 2006, that disbursements from that account had to be signed for by both Coastal and Travelers, and that Travelers therefore shared control with Coastal in how those funds were disbursed.  At that time, the Court did not have the benefit of Travelers' rebuttal evidence.  It is of course correct that the summary judgment record must be viewed in its entirety to determine whether reasonable inferences from the evidence, taken in the light most favorable to the nonmovant, create genuine issues of material fact for trial.  The Court could not do that on June 30 because the record was woefully underdeveloped on this point.  Any attempt to read any definitive "holding" into the June 30 Order (which was, after all, merely a supplemental briefing schedule based on deficient summary judgment submissions by both sides) is inaccurate and unwarranted.

-26-

support a conclusion that (a) Travelers obstructed, rejected or even influenced the disposition of Triple A and Thrasher's final payment applications, (b) Travelers extracted some inequitable benefit from this arrangement; or (c) Triple A and Thrasher were harmed by any inequitable conduct of Travelers.

For all of these reasons, the Court finds that Travelers is entitled to entry of summary judgment on the portion of its Rule 56 Motion against East Beach seeking a declaration that Travelers is not liable to East Beach under the Payment Bond in connection with any claim or lien asserted by Triple A or Thrasher.

### C. Are Thrasher and Triple A Entitled to Recovery from East Beach?

In addition to the parties' multiplicity of claims relating to the Payment Bond, both Triple A and Thrasher have asserted claims against East Beach for breach of contract and work and labor performed. The theory underlying these claims is simple: Triple A and Thrasher each contracted with East Beach to perform certain work on the Lighthouse project, for which East Beach agreed to pay them. Triple and A and Thrasher performed the agreed work and satisfied all contractual prerequisites, but East Beach never paid them.[36] Triple A and Thrasher now seek entry of summary judgment for the unpaid amounts by East Beach, which total $70,609 in Thrasher's case and $51,617.70 in Triple A's case, plus interest.

In response, East Beach does not dispute the validity of the Contractor Agreements into which it entered with Thrasher and Triple A. It does not dispute that Thrasher and Triple A actually performed the work and satisfied all contractual prerequisites for payment under those Agreements. It does not dispute that Thrasher and Triple A were never paid. Instead, the sole

---

[36] Remarkably, and notwithstanding the clear requirements of Rule 12(a)(1)(B), Fed.R.Civ.P., East Beach never saw fit to file a responsive pleading to either Triple A's Crossclaim or Thrasher's Crossclaim. Even when Triple A raised this omission in its summary judgment brief (doc. 142, at 3), East Beach failed to remedy it. The Federal Rules of Civil Procedure are not aspirational, and may not be casually disregarded by parties at their option. Moreover, Triple A and Thrasher failed to take action to enforce these pleading rules by filing motions for entry of default and default judgment when East Beach failed to comply with Rule 12. Had the Court become aware before now of East Beach's noncompliance with basic pleading requirements, and Triple A and Thrasher's failure to take any action to enforce those requirements, both sides would have been ordered to show cause for their failure to comport with and enforce bedrock federal pleading rules.

basis argued by East Beach for denial of Thrasher and Triple A's motions for summary judgment is that (a) East Beach had sent the subject funds to Coastal and had authorized their release to Thrasher and Triple A, but Coastal did not comply; and (b) Thrasher and Triple A's claims should be redressible under the Travelers' Payment Bond.  Of course, neither of these contentions, even if true, would obviate East Beach's liability to Thrasher and Triple A under breach of contract or work and labor performed theories.  East Beach's brief does not suggest otherwise, much less posit any legal authority that might support such a proposition.  Simply put, whether or not East Beach may have recourse against Coastal or Travelers is irrelevant to the question of whether it is liable to Thrasher and Triple A for breach of its contractual duties to them.  East Beach had a contractual obligation to pay Thrasher and Triple A for certain contracted work.  Thrasher and Triple A completed the work.  By not paying them, East Beach is in breach of the Contractor Agreements and is liable to both entities under Alabama law for breach of contract and work and labor performed.

The summary judgment record reflecting unambiguously that East Beach promised to pay Thrasher and Triple A for work performed on the Lighthouse project, that Thrasher and Triple A in fact performed said work, and that Thrasher and Triple A were not paid for said work, Thrasher and Triple A are entitled to entry of summary judgment as to their Crossclaims against East Beach.  Judgment will be entered in Thrasher's favor and against East Beach in the amount of $70,609.00, plus interest from January 12, 2007 through the present.  Judgment will likewise be entered in Triple A's favor and against East Beach in the amount of $51,617.70, plus interest from August 4, 2006 through the present.[37]

---

[37]    Under Alabama law, prejudgment interest is properly awarded on contract claims "where an amount is certain or can be made certain as to damages at the time of breach." *Federal Ins. Co. v. Dean Const. Co.*, 432 F. Supp.2d 1256, 1261 (M.D. Ala. 2006) (citing *Miller and Co., Inc. v. McCown*, 531 So.2d 888, 889 (Ala. 1988)); *see also Goolesby v. Koch Farms, LLC*, 955 So.2d 422, 429 (Ala. 2006) ("Prejudgment interest may be available in a breach-of-contract case ..., but only if damages were reasonably certain at the time of the breach.").  Here, there is no doubt that the amount of damages incurred by Thrasher and Triple A as a result of East Beach's breach of the Contractor Agreements was in an amount certain.  In the absence of any suggestion by any party as to the proper manner of calculating prejudgment interest in this case, the Court will impose simple interest at the default statutory rate of 6%, pursuant to Ala. Code § 8-8-8.  Therefore, prejudgment interest will be awarded in the amount of **$6,627.57** on

###### D.      Is Thrasher Entitled to Recovery from Coastal?

Thrasher has also brought a Third-Party Complaint against Coastal, asserting a single claim for breach of contract.  Thrasher now seeks summary judgment on that third-party claim.[38]

To the extent that Thrasher maintains that it had a contract with Coastal by virtue of the change orders and pay applications, the Court has already rejected that argument *supra*, as a matter of law, and Thrasher cannot recover from Coastal on that basis.  Thrasher's two alternative arguments fare no better.  First, Thrasher suggests (without a single citation of authority or any legal analysis whatsoever) that it was a third-party beneficiary of the Construction Manager Agreement between East Beach and Coastal.  This argument veers perilously close to frivolity.  In Alabama, "third-party-beneficiary principles focus upon the intent of the contracting parties."  *H.R.H. Metals, Inc. v. Miller ex rel. Miller*, 833 So.2d 18, 24 (Ala. 2002).  Thus, a complainant seeking third-party beneficiary status must show, *inter alia*, that the contracting parties intended, at the time of contract formation, to bestow a direct benefit upon that complainant.  *Id.* (citations omitted).  But the Construction Manager Agreement could not be any clearer in its expression of Coastal and East Beach's intent <u>not</u> to confer any such direct benefit on Thrasher, or anyone else.  Section 14.6 of that Agreement unequivocally provides that "the obligations and duties established herein are solely for the benefit of [East

---

Thrasher's claim, and in the amount of **$6,202.61** on Triple A's claim.  To the extent that any party believes the rate of interest should be computed differently, their complete failure to address the issue in their briefs constitutes a waiver of their right to be heard on the subject.

[38]      For unknown reasons, Coastal opted not to submit any response to Thrasher's Motion for Summary Judgment.  Summary judgment is not automatically granted by virtue of a nonmovant's silence.  To the contrary, the movant still must establish to the Court's satisfaction that the undisputed facts entitle it to judgment as a matter of law.  *See, e.g.*, *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 246 (2nd Cir. 2004) ("Although the failure to respond may allow the district court to accept the movant's factual assertions as true ..., the moving party must still establish that the undisputed facts entitle him to a judgment as a matter of law"); *Custer v. Pan American Life Ins. Co.*, 12 F.3d 410, 416 (4th Cir. 1993) ("the court, in considering a motion for summary judgment, must review the motion, even if unopposed, and determine from what it has before it whether the moving party is entitled to summary judgment"); *Anchorage Assoc. v. Virgin Islands Bd. of Tax Review*, 922 F.2d 168, 175 (3rd Cir. 1990) ("this does not mean that a moving party is automatically entitled to summary judgment if the opposing party does not respond").

Bay] and are not intended to benefit or create any obligation or duty to any other person, firm, or entity." As a matter of law, then, Thrasher is not a third-party beneficiary of the Coastal-East Beach Construction Manager Agreement, and cannot prevail on its breach of contract claim against Coastal on that basis.

Next, Thrasher asserts that even if it had no contract with Coastal, and even if it was not a third-party beneficiary of the Construction Manager Agreement, it remains entitled to judgment against Coastal on the doctrine of unjust enrichment. In so arguing, however, Thrasher conveniently overlooks the fact that it has not brought a claim for unjust enrichment against Coastal, but has instead framed its Third-Party Complaint solely in terms of breach of contract. *See generally Hancock-Hazlett General Const. Co. v. Trane Co.*, 499 So.2d 1385, 1387 (Ala. 1986) (reciting elements of unjust enrichment cause of action under Alabama law); *Tectonics, Inc. v. Castle Const. Co.*, 496 So.2d 704, 705 (Ala. 1986) (describing unjust enrichment as a "recognized cause[] of action in Alabama"). This Court will not grant summary judgment to Thrasher on the basis of a claim that it did not assert in its Third-Party Complaint against Coastal, that Coastal never consented to be joined herein, that is apparently raised for the very first time in Thrasher's summary judgment brief, and that Thrasher never placed Coastal on notice of its intent to pursue until now.

For all of the foregoing reasons, Thrasher's Motion for Summary Judgment as to Coastal is **denied**. What's more, because it is pellucidly clear from the summary judgment record that Thrasher cannot prevail on a breach of contract theory against Coastal as a matter of law, there is no conceivable need for this claim to proceed to trial, notwithstanding Coastal's failure to file a cross-motion for summary judgment. Accordingly, because the issue has been fully developed and decided herein on the basis of a complete evidentiary record, the Court hereby **grants** summary judgment in Coastal's favor on the Third-Party Complaint, and the Third-Party Complaint is **dismissed with prejudice**. *See generally Artistic Entertainment, Inc. v. City of Warner Robins*, 331 F.3d 1196, 1202 (11th Cir. 2003) ("where a legal issue has been fully developed, and the evidentiary record is complete, summary judgment is entirely appropriate even if no formal notice has been provided").

-30-

###### E.    Is Travelers Entitled to Indemnity and Reimbursement from East Beach?

Finally, the Court turns its attention to the portion of Travelers' Motion for Summary Judgment against East Beach (doc. 141) seeking a monetary judgment in the amount of $150,090.25 in reimbursement of amounts erroneously paid to A-1 Glass by Travelers under the Payment Bond, when such claims were not covered under the Payment Bond at all.  Travelers predicates this claim on Alabama's doctrine of equitable subrogation and common-law principles of assignment.  *See, e.g., Carter v. Carter*, 38 So.2d 557, 559 (Ala. 1948) ("One who has paid a debt under a colorable obligation to do so ... is entitled to be subrogated; and where one pays a debt in good faith believing that he has an interest to protect, he will be subrogated although he be mistaken in that belief.") (citation omitted); *Atlantic Nat'l Trust, LLC v. McNamee*, 984 So.2d 375, 2007 WL 2898263, *4 (Ala. 2007) (explaining that under Alabama common law, valid assignment confers same rights, benefits and remedies on assignee that assignor possesses).  The undisputed facts concerning this cause of action are as follows: (a) A-1 Glass performed services on the Lighthouse project pursuant to a contractor agreement with East Beach that was substantially similar to those executed by Triple A and Thrasher with East Beach; (b) East Beach did not pay A-1 Glass's final payment application in the amount of $150,090.25 for work performed on the Lighthouse project; (c) Travelers did pay the claim, on the understanding that A-1 Glass was a valid claimant under the Payment Bond; (d) A-1 Glass assigned its claims and rights (including its claims against East Beach) to Travelers; and (e) Travelers has now determined that A-1 Glass was not a valid claimant and seeks reimbursement from East Beach.

In response, East Beach is silent, offering no specific argument of any kind that Travelers is not entitled to recover the amounts paid to A-1 Glass.  East Beach contests neither the validity of the assignment nor the application of equitable subrogation to these circumstances.  At most, East Beach appears to maintain that Travelers is not entitled to reimbursement because A-1 Glass was a valid claimant on the Payment Bond for the same reasons that Triple A and Thrasher were valid claimants.  But the Court has already determined that Triple A and Thrasher were not valid claimants.  There is neither evidence nor argument before the Court suggesting that A-1 Glass is situated any differently under the Payment Bond than Triple A and Thrasher were.  Based on the summary judgment record, the Court concludes as a matter of law that A-1 Glass was ineligible to make a claim under the Payment Bond for the same reasons that Triple A and

-31-

Thrasher were ineligible.  Therefore, there are no genuine issues of material fact, and Travelers is entitled to recover the amount of that erroneous payment from East Beach, with interest, as a matter of subrogation and pursuant to the assignment made in Travelers' favor by A-1 Glass. Accordingly, judgment will be entered against East Beach and in favor of Travelers in the amount of $150,090.25, plus prejudgment interest calculated at 6% and dating from March 20, 2007 (the date A-1 Glass executed an assignment in Travelers' favor), for a total judgment of **$162,525.12**.[39]

## IV.   Conclusion.

For all of the foregoing reasons, it is hereby **ordered** as follows:

1. Travelers' Motion for Summary Judgment as to Jennings Service Company (doc. 138) is **moot** in light of the fact that all claims relating to Jennings have been dismissed at the parties' joint request;

2. Thrasher Waterproofing's Motion for Summary Judgment against East Beach, Travelers and Coastal Builders (doc. 136) is **granted in part**, and **denied in part**. The Motion is **granted** with respect to Thrasher's claims against East Beach, and judgment will be entered in Thrasher's favor against East Beach in the amount of **$77,236.57**, inclusive of prejudgment interest.  In all other respects, Thrasher's Motion for Summary Judgment is **denied**.

3. The Court *sua sponte* **grants** summary judgment in favor of Coastal as to the Third-Party Complaint brought against it by Thrasher.  All of Thrasher's claims against Coastal are **dismissed with prejudice** because Thrasher's only claim against Coastal sounds in breach of contract, but there was no contract between those entities.

4. Triple A Fire Protection's Motion for Summary Judgment (doc. 142) is **granted in part**, and **denied in part**.  The Motion is **granted** with respect to Triple A's claims against East Beach, and judgment will be entered in Triple A's favor

---

[39]      Again, no party having argued or suggested any alternate means of computing prejudgment interest in this case, the Court finds that the parties have waived any arguments or objections they might have concerning the methodology identified herein.

against East Beach in the amount of **$57,820.31**, inclusive of prejudgment interest.  In all other respects, Triple A's Motion for Summary Judgment is **denied**.

5.      Travelers' Motions for Summary Judgment against Thrasher, Triple A, and East Beach (docs. 139, 140, and 141) are **granted**.  The Court will enter a declaratory judgment providing that (a) Travelers is permanently released from any and all liability to Thrasher and Triple A under Payment Bond number 104295762; and (b) Travelers is permanently released from any and all liability to East Beach under that same Payment Bond in relation to any claim and/or lien asserted by Triple A or Thrasher.  Judgment will also be entered in Travelers' favor on its claims for monetary damages against East Beach in the amount of **$162,525.12**, inclusive of prejudgment interest.

6.      Thrasher's Motion to Amend or Correct its Memorandum of Law (doc. 145) is **granted**.

7.      Inasmuch as these rulings dispose of all pending claims and issues joined in this litigation, the Clerk's Office is directed to close this file for administrative and statistical purposes.

8.      A separate judgment will enter.

DONE and ORDERED this 7th day of August, 2008.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE